STUART HANLON, Esq. CSBN: 066104
LAW OFFICES OF STUART HANLON
179 11th Street, 2nd Floor
San Francisco, CA 94103
PH: (415) 864-5600
FAX: (415) 865-0376
Email: stuart@stuarthanlonlaw.com

Attorney for Defendant
LAUTON JOSHUA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff,<br>vs.<br>LAUTON JOSHUA,<br>    Defendant. | No. CR-07-0555 WHA<br>**DEFENDANT'S MEMORANDUM RE SENTENCING**<br>Date: May 20, 2008<br>Time: 2:00 p.m.<br>Ctrm: Hon. William H. Alsup |

    Ms. Joshua (Ms. Wells) submits the following memorandum to address the presentence report, the application of the factors set forth in the sentencing statutes and sentencing guidelines, as well as to suggest what she believes is a reasonable sentence in matter and pursuant to those statutes. Ms. Wells' sentencing is presently set for May 20, 2008.

    On August 23. 2007 an Indictment was filed in the Northern District against Ms. Wells. Ms. Wells was charged with ten counts of mail fraud under 18 U.S.C. §1341.

    Ms. Wells and the government reached a plea agreement in this case. Ms. Wells pled guilty to violating Count One, a violation of 18 U.S.C. §1341. As noted in the Presentence Report, the Sentencing Act allows for a term of imprisonment up to twenty years. 18 U.S.C. §1341.

1

The presentence report calculates Ms. Wells as a Criminal History Category I with an offense level of fourteen (14). The Sentencing Guidelines place the range of custody at fifteen (15) to twenty-one (21) months. In light of the numerous factors under 18 U.S.C. §3553, taking in to account her personal background and lack of criminal history, the probation officer recommends the low-end of fifteen (15) months with eight (8) months imprisonment and seven (7) months of home detention followed by three years of supervised. As noted above, this calculation was based on a base offense level of 14, which under a Criminal History Level I provides for the low-end of fifteen (15) months (the probation officer used the loss amount as provided by HUD of $126, 934.00).

However, the plea agreement provided that Ms. Wells may argue the loss amount caused by her offense conduct is as low as, but not less than $70,001. Under the guidelines a loss amount in the range of $70,001 to $119,999 carries an additional eight (8) levels. The loss amount claimed by the San Francisco Housing Authority is $126, 934, which is in the loss amount range of $120,000 to $199,999, adding an additional ten (10) levels. This places Ms. Wells with either an adjusted offense level of thirteen (13) or fourteen (14) depending on the determined loss amount. With sentencing ranges of fifteen (15) months to twenty-one (21) months and twelve (12) months to eighteen (18) months, respectively. This plea agreement is pursuant to Federal Rules of Criminal Procedure 11(c)(1)(A) and (C)(1)(B).

## LOSS AMOUNT

The defendant maintains that the loss amount attributable to her is lower than $126, 934, and in fact stands at $119,215. This determination is based on the fact that, after Ms. Wells purchased her family home in Lincoln, Ca, she requested she be removed from the program. This occurred in May 2006. However, Ms. Lowe, her co-defendant, continued to receive payments through November 2006, but these monies should not be attributable to Ms. Wells who believed she was off the program.

Starting in May 2006, HUD payments were directly deposited into Ms. Lowe's account. (*See* Exhibit A: Memorandum of Interview, noting HAP direct deposits in 2006). When Ms. Wells purchased her home in Lincoln, CA, Ms. Wells requested she be terminated from the

1  program in May 2006 by calling her caseworker Ms. Gonzalez.  She was told by Ms. Gonzalez
2  that she had to submit her request in writing which she did in June 2006.  Unbeknownst to Ms.
3  Wells, money continued to be sent to Ms. Lowe until November 2006.  From June 2006 until
4  November 2006, HUD made payments totaling $7719.00.[1]  If the payments from June 2006
5  through November 2006 are subtracted from the $126, 934 loss to HUD, the total remaining is
6  $119,215.  This amount is representative of the loss attributable to Ms. Wells.  Thus, Ms. Wells
7  has an adjusted offense level of thirteen (13) with a guideline range of twelve (12) months to
8  eighteen (18) months.

9        Counsel spoke with Tony Ucciferri from the San Francisco Housing Authority.  (*See*
10  Exhibit B: Declaration of Counsel).  Counsel was told by Mr. Ucciferri they were unable to find
11  the original written request by Ms. Wells in her file.  However, Mr. Ucciferri is certain that a
12  request "to move" must have been made by Ms. Wells because he made this indication to Special
13  Agent James Luu in an email discussion about this case.  (*See* Exhibit C: Email of Tony
14  Ucciferri.)  In this email exchange, Special Agent Luu asks Mr. Ucciferri why payments were
15  stopped in November 2006, to which Mr. Ucciferri responds, "She asked to move and HAP was
16  held." (*Id*.)  The "she" must be referring to Ms. Wells because she was the tenant and Ms. Lowe
17  the owner of the property.   When counsel spoke with Mr. Ucciferri, he stated he would not have
18  written his email if it was not in fact true, but he had no independent recollection of the facts and
19  could not find anything in the file.  Mr. Ucciferri stated there would be no other reason for him to
20  make this statement to Agent Luu, but for Ms. Wells making such a request.

21        There may be issue with the difference between a request "to move" and a request "to
22  terminate."  However, it is Counsel's understanding that a request to move contains several
23  documents for reissuance of Section 8 assistance at a new address.   This includes a new Section
24  8 voucher that is good for sixty (60) days to find other housing.   If a new address is not provided,
25  than the voucher expires.  None of these documents were part of her file.   It seems impossible

---

[1] The calculations are based on the monthly payments made to Ms. Lowe from May 2006 through November 2006.

that such a process was initiated, including the issuance of a new voucher, and that no paperwork exists. What is known is that Ms. Wells stopped her communication with HUD. Mr. Ucciferri also states in the email exchange to Agent Luu that Ms. Wells has not been responding to their notices, so they have proposed her for termination.[2] (*See* Exhibit C.) However, the bottom line is that Ms. Wells was not receiving any money during this time period attributable to her. Perhaps there was confusion by HUD that she had requested to move and not be terminated, but regardless, according to HUD, she took no further actions to reinstate the new voucher (which Ms. Wells denies was ever issued).

According to the Sentencing Guidelines a loss range in the amount of more than $70,000 but less than $119,999, adds eight (8) levels to the base offense level of 7. With the two level decrease for acceptance of responsibility, the adjusted offense level is thirteen (13). This carries a sentencing range of twelve (12) to eighteen (18) months.

## STATEMENT OF CASE

Beginning in 1998, Ms. Wells, along with her grandmother Helen Lowe, falsely reported to the San Francisco Housing Authority that they were unrelated to each other in order to qualify for assistance under HUD's Section 8 housing program. In addition, Ms. Wells failed to report her true employment in order to qualify for the program. Ms. Wells showed less income than she was receiving to meet the program's guidelines. In 1998, Ms. Wells, along with Ms. Lowe, purchased a home in Suisun, Ca. Ms. Wells and Ms. Lowe subsequently purchased another home in 2006 in Lincoln, Ca. Ms. Wells lived in these homes with her family and not at the address of 151 Margaret as reported to HUD and as required by HUD to receive the assistance under the Section 8 housing program. Both of these homes (in Suisun and Lincoln) are in foreclosure and currently part of bankruptcy proceedings. The government has not moved to

---

[2] Counsel can only surmise what may have happened here, but it is very likely Ms. Wells' request for termination was misplaced and she was left thinking she was off the program, as HUD admittedly had no contact with her and thought she had just left the program without giving notice; or, in the alternative, HUD knew there was a request made (but lost the paperwork) and assumed it was to move (as is the case with most people on the program), but again, the result is the same-Ms. Wells had no contact with the program.

forfeit either of these properties.

**DEFENDANT'S HISTORY**

Ms. Wells was raised by a mother who suffered from mental health issues and drug addiction. Her father was not, and has not, been a part of her life. Ms. Wells was raised by her mother's boyfriend James Kelly until he was incarcerated for bank robbery. Mr. Kelly also was addicted to narcotics. Her half-brother has also had issues with drug addiction and is currently incarcerated. Despite a troubled childhood, Ms. Wells strove to educate herself, achieve successful employment and at the same time raise her two children.

For most of her marriage to Mr. Wells, Ms. Wells has been the sole provider for her entire family. Mr. Wells spent many years disabled and unable to work. During this time, Ms. Wells, not only worked to provide her family with food and shelter, she went to school at night to receive her Bachelor's degree and later her Master's degree. Ms. Wells even attempted to go to law school while working full-time, but was unable to maintain the necessary GPA.

Her eldest son, is graduating from the University of Michigan and is a high-ranked ROTC officer. He has become a successful young man and did not succumb to a life of crime as many African-American males raised in the city do because of the care his mother provided to him. Ms. Wells has an eleven-year old son who lives with her at home.

The Defendant has no criminal history and no prior arrests.

**OFFENSE CONDUCT**

This case is not representative of most "welfare" fraud cases. This is not a situation where Ms. Wells took this money and sat back unemployed buying cars and homes with the financial assistance. Throughout the time period in question, Ms. Wells was gainfully employed and continued to go to school to achieve better employment.

During all but one of the years from 1998 to 2006, Ms. Wells' annual salary was below $50,000. (*See* Exhibit D: Salary Chart.) For most of the years, this was the sole income to support her family of four in the bay area. Her husband, Timothy Wells was injured, had run through his disability, and was unemployed. The monthly monies received from HUD were also split between Ms. Wells and Ms. Lowe. Ms. Wells used the housing she had secured through

HUD to house her mother and brother who would not have qualified for the program on their own.  Ms. Lowe would take $500 of the monthly payments for "rent" and additionally charge Ms. Wells for letting her mother and brother stay at the apartment (either her mother or brother, or both, have lived at 151 Margaret from 1998 to the present.)   This amount would vary depending on how much money was received from HUD, but was typically anywhere from $200 to $400 per month.  The remaining money would be used by Ms. Wells to support herself and her family.  The amount Ms. Wells received, after paying Ms. Lowe, over the time period of 1998 to 2006 varied because the monthly payments from HUD also varied.   However, over the period of time the average monthly monies received was just over $1000.00.  After subtracting the money given to Ms. Lowe, Ms. Wells did not receive a substantial amount of these funds.

The home Ms. Wells purchased in Suisun, CA in 1998, was purchased with no down payment and 100% financed.  The closing costs were paid by her employer because the move was job-related.  The second home that was purchased in Lincoln, CA in 2006 was also purchased with 100% financing, and Ms. Wells, after purchasing this home, asked to be removed from the program.   Both of these homes are now in foreclosure and Ms. Wells has declared bankruptcy.

Ms. Wells has always maintained regular employment.   Her motivation behind these crimes was not one of greed.  She fully accepts she made poor choices, erred in her judgment and broke the law.

## SENTENCING OPTIONS

Based on the above explanation concerning the amount of loss, Ms. Wells requests this court find the loss amount to be in the range of $70,001 to $119,999.  According to the guidelines, the sentencing range is twelve (12) to eighteen (18) months.

The presentence reports asks for a "split" sentence of incarceration and home detention. Counsel agrees with the basis for this "unique" sentence that is recommended by the probation officer.   Ms. Wells committed this crime out of concern for her family and their livelihood. While she fully accepts what she has done was illegal, and wrong, she was never motivated by greed.  She provided a stable home for her family and consistently worked during the time she

received these benefits.

Under 18 U.S.C. §3553(a)(1), looking at the nature and circumstances of this offense, this was not a "scam" in the traditional sense one usually sees in these types of cases. Ms. Wells was not getting rich from the money she received from HUD. This was money Ms. Wells took and used in order for her and her family to live. Her husband was unemployed and they were raising two children. This money provided food and shelter for her family. Though it was restricted under the Section 8 program to move to Suisun, at the time she justified this choice because it gave her the ability to provide a home for her family. She would not have been able to do this without the Section 8 money. Further, she moved her brother and mother into the house at 151 Margaret Avenue, her mother on social security and her brother unemployed. Thus, she was providing for them as well by making this move to Suisun.

Additionally, under 18 U.S.C. §3553(a)(1), the history and characteristics of Ms. Wells, speaks volumes. Ms. Wells has lived an upstanding life, but for committing this offense. She was raised in a family surrounded by drug abuse, but did not succumb to that life. Instead, she has worked and gone to school at nights to try and achieve better for herself and for her family. With her husband not working, her entire family was dependent on her to provide for them. Not only did she make sure that her family was provided for, she spent any extra time she had trying to achieve a better education and better employment. On top of it all, she somehow found the time to volunteer. She has worked with several organizations to help others in need including working as a Court Appointed Special Advocate (through CASA) and as a mediator for small claims disputes in Solano County. Looking at her family, Ms. Wells has raised one son who is attending the University of Michigan and doing very well. She also has one son still at home and it makes little sense in the interest of justice to take his mother away from him for any lengthy period of time when she is the foundation of this family.

As stated in her letter to this Court, (*See* Exhibit E: Letters to the Court.), Ms. Wells is disappointed in herself and has, because of this case, lost her job, her home, has had to file bankruptcy and may even lose her marriage. Ms. Wells reassures this Court that she will not commit any further crimes.

**CONCLUSION**

Based on Ms. Wells's lack of criminal history, her background, the plea agreement with the Government, and the adjusted loss amount the Defendant requests a sentence of no more than twelve (12) months.   The Defendant requests this be served with six (6) months of incarceration and six (6) months of home detention.

All other conditions recommended by the probation officer are appropriate.

Dated: May 13, 2008                                   Respectfully Submitted,

s/Stuart Hanlon, CSBN: 66104
Attorney for Defendant
LAUTON JOSHUA
179 - 11th Street, 2nd Fl,
San Francisco CA 94103
415/864-5600
stuart@stuarthanlonlaw.com